[No. 59973-4.   En Banc.   July 21, 1994.]

CLAUDETTE CAUGHELL, ET AL, *Appellants*, v. GROUP HEALTH COOPERATIVE OF PUGET SOUND, et al, *Respondents*.

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins* and *Catherine W. Smith; Nelson Anderson Krafchick,* by *Steven P. Krafchick,* for appellants.

*Rosenow, Johnson, Graffe, Keay, Pomeroy & Moniz,* by *John C. Graffe* and *D. Jeffrey Burnham,* for respondents.

*Bryan P. Harnetiaux* and *Gregg L. Tinker* on behalf of Washington State Trial Lawyers Association, amicus curiae for appellants.

GUY, J. — More than 50 years ago, the Oregon Supreme Court concluded that continuing negligent medical treatment "constituted but a single cause of action. Where the tort is continuing, the right of action is continuing." *Hotelling v. Walther,* 169 Or. 559, 565, 130 P.2d 944 (1942). We reach the same conclusion today. Plaintiff Claudette Caughell alleges that her doctor committed medical malpractice by negligently prescribing Etrafon, an antidepressant and antipsychotic medication, and Valium to her over a period of 20 years. On summary judgment, the trial court limited Mrs. Caughell's claim solely to negligent acts or omissions which occurred in the 3 years prior to the day she filed her complaint. We hold that the statute of limitations for claims of medical malpractice, RCW 4.16.350,

does not bar her claim for continuing negligent treatment[1] spanning 20 years.

## FACTS

■ Because we review this case on appeal from a grant of summary judgment to Defendants, we state the following facts which support the position of the nonmoving party, Mrs. Caughell. *Margola Assocs. v. Seattle*, 121 Wn.2d 625, 854 P.2d 23 (1993). We express no opinion on the correctness of these facts.

Mrs. Caughell joined Group Health Cooperative of Puget Sound in 1965, and on November 18, 1965, had her first visit with Dr. Robert Sherry, a primary care physician at Group Health. Dr. Sherry became her regular and primary care physician. During the next $2^1/2$ years, he treated Mrs. Caughell for routine ailments as well as for various "physical complaints for which no organic basis was found". Clerk's Papers, at 165.

On February 13, 1968, Dr. Sherry briefly examined Mrs. Caughell again, diagnosed "free-floating anxiety", and prescribed Valium to Mrs. Caughell. According to Dr. Sherry, Mrs. Caughell had used Valium before and told him that "this was the thing that helped her the most". Clerk's Papers, at 165. Dr. Sherry also referred Mrs. Caughell to Group Health's Mental Health Services for mental therapy. Ten days later, Mental Health Services prescribed Etrafon. Mrs. Caughell attended individual or group therapy at Mental Health Services at least until 1977.

Dr. Sherry treated Mrs. Caughell for a variety of physical illnesses for over 20 years. Present frequently were her complaints of anxiety and related physical symptoms — weight loss, fatigue, dizziness, fast heartbeat, and tightness in her chest. Dr. Sherry prescribed combinations of Etrafon and Valium to her without interruption from February 1968 through February 1988.

---

[1]The term "continuing negligent treatment" means a series of interrelated negligent acts or omissions occurring during a course of treatment. We define this term precisely in part II of our opinion.

Sometime in the late 1970's, Mrs. Caughell read *I'm Dancing As Fast As I Can*, a best seller which detailed the author's addiction to prescription drugs, including Valium. Mrs. Caughell worried about her growing dependence on Valium and questioned Dr. Sherry about it. According to Mrs. Caughell, Dr. Sherry assured her that she was taking a very low dosage and that addiction was not a problem. Later, Mrs. Caughell read Betty Ford's autobiography which described the former First Lady's addiction to prescription drugs. According to Mrs. Caughell, when she questioned Dr. Sherry again about the possibility of addiction, he reassured her that she was taking a low dosage and was not abusing the drug.

Mrs. Caughell continued to receive prescriptions of Valium and Etrafon from Dr. Sherry and to refill them regularly. Dr. Sherry stated that he had to approve all refills "so that I can monitor the dose of the medication and the amount that's being used." Clerk's Papers, at 247. Dr. Sherry's last prescription of Valium occurred on November 18, 1987, but Mrs. Caughell received at least one refill of the prescription on January 7, 1988, and continued to take Valium under Dr. Sherry's care until March 1, 1988. Mrs. Caughell met with Dr. Sherry at least twice after January 30, 1988, once on February 16, 1988, and once on March 1, 1988.

On March 1, 1988, Mrs. Caughell visited Dr. Sherry for the last time. According to Dr. Sherry, Mrs. Caughell was depressed and extremely emotional about her dependence on Valium. Mrs. Caughell's friends and family had confronted her a month earlier about her possible addiction. At this last visit with Dr. Sherry, Mrs. Caughell told Dr. Sherry that she no longer wanted to take the drug. Dr. Sherry referred Mrs. Caughell to ADAPT, an alcohol and drug treatment program at Group Health, and this referral ended Dr. Sherry's treatment of Mrs. Caughell. She saw an ADAPT counselor on March 1, 1988, and the next day a doctor at ADAPT created a benzodiazepine (Valium) detoxification program for her.

Mrs. Caughell kept a diary during this period of detoxification and described symptoms of withdrawal, including

insomnia, contractions, headaches, and sensations of burning. Mrs. Caughell's current doctor, a neuropsychiatrist, has diagnosed various movement disorders which allegedly resulted from her long-term use of Valium and Etrafon. On May 30, 1989, Mrs. Caughell consulted an attorney and, by her own admission, understood that litigation was a choice in her case. On January 30, 1991, a year and one-half later, Mrs. Caughell filed suit against Dr. Sherry and Group Health.

This case is now before us on direct review of the trial court's summary judgment in favor of Defendants Group Health and Dr. Sherry. In their motion for partial summary judgment, Defendants contended that the statute of limitations for claims of medical malpractice, RCW 4.16.350, had expired on any alleged negligence dating prior to January 30, 1988 — 3 years prior to the date Mrs. Caughell filed her complaint. The trial court granted Defendants' motion for partial summary judgment. When Plaintiff conceded that she could not segregate the damages caused by Defendants prior to January 30, 1988, from those caused after that date, the trial court entered final judgment of dismissal against Plaintiff.

## ISSUES PRESENTED

Mrs. Caughell's appeal presents two issues:

First, may a plaintiff allege, as a single claim of medical malpractice, the entire course of continuing negligent treatment?

Second, did the statute of limitations run on Mrs. Caughell's claim for the negligent prescription of Valium and Etrafon? As described below, this second issue requires us to examine both the elements of a claim for continuing negligent treatment and the effect of the discovery rule on this claim of malpractice.

## ANALYSIS

### I

Medical malpractice has not always fit comfortably within the general rules of tort. Prior to 1969, this court made no

exceptions for claims of medical malpractice when it applied the statute of limitations. Two statutes, former RCW 4.16.010 and RCW 4.16.080(2), required malpractice claimants, like any tort claimant, to file suit within 3 years "after the cause of action shall have accrued". *See* former RCW 4.16.010. In *McCoy v. Stevens*, 182 Wash. 55, 44 P.2d 797 (1935), the court rejected a claim for malpractice which alleged not only a negligent act, using x rays "for the purpose of preventing conception", but also the negligent treatment used to cover up the severe burns which followed. *McCoy*, 182 Wash. at 56. Later, in *Lindquist v. Mullen*, 45 Wn.2d 675, 678, 277 P.2d 724 (1954), the court held that plaintiff Lindquist had 3 years from the *occurrence* of her injury, not its discovery, to file suit. Lindquist's doctor had left a sponge in her hernia incision, causing her a great deal of pain.

The court tempered its approach in 1969. In two opinions, we acknowledged that malpractice claims posed unique difficulties which required the court to modify the general statutes of limitations. As a consequence, this court adopted two corollaries to the statutes of limitations: the discovery rule and the continuing-course-of-treatment rule. The first of these two opinions, *Ruth v. Dight*, 75 Wn.2d 660, 453 P.2d 631 (1969), begins with a timeless description of the tension between the peculiar circumstances of medical malpractice and the rigid application of legal rules:

> There is a saying that what one does not know does not hurt him, but, when it comes to surgical operations, this old bromide has turned out to be no more than half a truth. Nature has a mysterious way at times of hiding mishaps in surgery, and cases are legion where foreign objects such as sponges, scalpels, forceps and hemostats have been inadvertently left in a surgical wound and the patient remained oblivious of it for years afterward. Although on discovery of the oversight the surgeon can later provide a medical remedy, the statute of limitations as construed by this court usually blocks a legal remedy.

*Ruth*, 75 Wn.2d at 661.

Some 22 years after plaintiff Ruth's hysterectomy, surgeons discovered a sponge left in her abdomen. Contrary to

most torts, plaintiff Ruth did not immediately know of her injury, let alone of its nature or cause. The court recognized this difference and adopted the discovery rule, holding that "the statute of limitations (RCW 4.16.080(2)) . . . commences to run when the patient discovers or, in the exercise of reasonable care for his own health and welfare, should have discovered the presence of the foreign substance or article in his body." *Ruth*, 75 Wn.2d at 667-68.

One month after *Ruth*, the court acknowledged a second distinction between malpractice claims and other torts: that injury could result from a series of interrelated negligent acts — a negligent course of treatment — rather than from a single act of negligence. In *Samuelson v. Freeman*, 75 Wn.2d 894, 454 P.2d 406 (1969), plaintiff Samuelson fractured her right femur in an automobile accident. Defendant Freeman, an orthopedic specialist, set the broken leg by attaching a metal plate and screws for fixation and by applying a plaster cast to immobilize her thigh and leg. This operation took place on September 18, 1960.

During her recovery from the operation, Samuelson developed a bone infection. On April 1, 1964, some 3 years 7 months after the operation, Samuelson sued Dr. Freeman for negligent diagnosis, treatment and care occurring between April 1, 1961, and April 1, 1964, the 3-year statutory period. At trial, Samuelson sought to amend her complaint to include an allegation that Dr. Freeman "negligently used screws and plate of different metals which produced an electrolysis in the wound and caused a continuing injury during postoperative treatment." *Samuelson*, 75 Wn.2d at 895. The trial court denied the amendment, ruling that under the 3-year statute of limitations, plaintiff could not recover for any negligence occurring before April 1, 1961.

This court reversed and allowed plaintiff to state a cause of action for continuing negligence spanning more than the 3-year statutory period.

> Plaintiff charged the defendant with *continuing negligence* from the time of the surgery, but because of the existing interpretation of the 3-year statute of limitations governing mal-

practice cases, damages were limited to acts and omissions occurring within the 3 years preceding the commencement of the action. In construing the statute of limitations concerning medical malpractice, we think it a sound rule that, if malpractice is claimed during a continuous and substantially uninterrupted course of treatment for a particular illness or condition, the statute does not begin to run until the treatment for that particular illness or condition has been terminated. *Hotelling v. Walther*, 169 Ore. 559, 130 P.2d 944, 144 A.L.R. 205 (1942). *See* Annot., 80 A.L.R.2d 368 (1961).

The continuing-course-of-treatment rule makes a sensible corollary to the rule that the statute of limitations ordinarily begins to run either from the occurrence of the negligent act or omission, if the injuries therefrom are manifest, or if not apparent, then from the time that the patient discovered the injury, or earlier, if in the exercise of ordinary concern for his own health and welfare and in the exercise of reasonable diligence he should have discovered the injury. In declaring these principles, we are, of course, departing from the *Lindquist* [*v. Mullen*, 45 Wn.2d 675, 277 P.2d 724 (1954)] rule and also that part of *McCoy v. Stevens*, 182 Wash. 55, 44 P.2d 797 (1935), which rejected the continuing-course-of-treatment concept.

(Some italics ours.) *Samuelson*, 75 Wn.2d at 900-01.

██ Here, then, is the first ground for our present ruling: in *Samuelson*, we simultaneously recognized that a cause of action exists for continuing negligent treatment *and* that this cause of action accrues when the treatment for the particular illness ended. Because the court labeled its holding a "rule", the fact that the court also created a substantive claim may be overlooked. However, recognition of a single cause of action was essential to the court's holding. First, the opinion allowed plaintiff Samuelson to expand her claim of negligence beyond the 3-year statutory period. This was possible only if the court acknowledged a single cause of action which encompassed the entire period of negligent treatment. Second, the court overruled that portion of *McCoy* which insisted that each act of negligence, whether interrelated or not, represented a separate claim of malpractice.

Finally, the court's citation to the Oregon Supreme Court's opinion in *Hotelling* confirmed the creation of a claim for continuing negligent treatment.

". . . As alleged, the treatments were not separate and distinct acts, separate and distinct causes of action. They constituted an entire course of treatment of a case undertaken by defendant to be treated by him, and the whole thereof constituted but one cause of action. . . ."

*Hotelling*, 169 Or. at 565 (quoting *Peteler v. Robison*, 81 Utah 535, 549, 17 P.2d 244 (1932)). The distinction between the claim for continuing negligent treatment, on the one hand, and the end point of the claim, on the other, becomes extremely important in light of the statutory changes which followed our decisions in *Ruth* and *Samuelson*.

On March 23, 1971, the Legislature enacted a new statute of limitations solely for claims of medical malpractice. *See* Laws of 1971, ch. 80. That statute, codified as RCW 4.16.350, declared that any civil action for damages

based upon alleged professional negligence shall be commenced within (1) three years from the date of the alleged wrongful act, or (2) one year from the time that plaintiff discovers the injury or condition was caused by the wrongful act, whichever period of time expires last.

In 1976, the Legislature amended RCW 4.16.350 by substituting the phrase "act or omission alleged to have caused the injury or condition" for "date of the alleged wrongful act". *See* Laws of 1975, 2d Ex. Sess., ch. 56, § 1. The current statute reads in pertinent part as follows:

Any civil action for damages for injury occurring as a result of health care which is provided after June 25, 1976 against:

(1) A . . . physician . . .;

. . . or

(3) . . . [A] health maintenance organization . . . based upon alleged professional negligence shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later, except that in no event shall an action be commenced more than eight years after said act or omission: PROVIDED, That the time for commencement of an action is tolled upon proof of fraud, intentional concealment, or the presence of a foreign body not intended to have a therapeutic or diagnostic purpose or effect.

RCW 4.16.350.

What little legislative history exists regarding this statute illustrates that the Legislature assumed without discussion that a malpractice claim consisted of a single, wrongful act. In a 1971 memorandum to the Speaker of the House, the House Judiciary Committee explained the reasons for the statute:

> Rising malpractice insurance costs make the costs of practicing medicine high. One problem is that exposure is open-ended and a claim can be brought many years after the *wrongful act*. This bill would require a plaintiff to react promptly upon discovery of malpractice.

(Italics ours.) House Comm. on Judiciary, Memorandum to Speaker re House Bill 720 (Feb. 18, 1971).

There is no evidence that the Legislature intended the statute either to endorse or to exclude claims for continuing negligent treatment. In fact, during the hearings on the health care injuries act, proposed in 1975 by the Washington State Medical Association, the Senate Chair of the Joint Select Committee on Medical Malpractice wrote that "[t]hroughout the presentation of [the] proposed statute of limitations changes, the question remains what statute of limitations applies in a negligent drug prescription case involving mental problems." Preliminary Consideration Regarding the Washington State Medical Association's Proposed Legislation, "Health Care Injuries Act", found in Senate Judiciary Bill File, Substitute Senate Bill 3039, 44th Legislature (1975). The Chair's concern went unanswered. This is the *only* reference in the legislative history to claims of continuing negligent treatment.

We now reach the second ground for our opinion: the statute of limitations for claims of medical malpractice did not extinguish the claim for continuing negligent treatment first recognized in *Samuelson v. Freeman*, 75 Wn.2d 894, 454 P.2d 406 (1969). The statute requires a plaintiff to file suit either 1 year after plaintiff discovered or should have discovered the negligent act[2] which caused injury, or 3 years from

---

[2]Whenever we use the phrase "negligent act", we include in its definition the corresponding "negligent omission".

the negligent act which caused the injury. The statute also places an 8-year cap on the time in which a plaintiff could discover the claim for malpractice. Nothing in the statute or its legislative history suggests that the Legislature intended to do away with claims for continuing negligent treatment extending more than 3 years.

The statute of limitations did, however, modify *when* the clock starts ticking on these claims. In *Bixler v. Bowman*, 94 Wn.2d 146, 614 P.2d 1290 (1980), we addressed for the first and, to this point, only time the effect that RCW 4.16.350 had on the continuing-course-of-treatment rule. Plaintiff Bixler had been a patient of defendant Bowman for more than 17 years when she discovered a lump in her right breast. On January 23, 1975, she told Dr. Bowman about the lump and he prescribed a course of self-examination. On April 29, 1975, 3 months later, Mrs. Bixler consulted Dr. Bowman again about the lump and he told her to continue the self-examination. She did not see him again.

On August 4, 1975, Mrs. Bixler visited another doctor who diagnosed a "probably malignant tumor", and 3 days later she had a radical mastectomy. *Bixler*, 94 Wn.2d at 147. In spite of radiation and chemotherapy, the cancer spread to her other breast, and on April 1, 1977, she had a radical mastectomy to remove her left breast.

Mrs. Bixler filed her malpractice suit on June 8, 1978, and, as a result, created a conflict concerning the application of the statute of limitations. If her claim dated from defendant's last act of negligence — the last visit on April 29, 1975 — she had until April 29, 1978, to file suit. Under this theory, her suit was more than a month late. The trial court adopted this approach and dismissed her complaint. If, however, her claim dated from the end of the physician-patient relationship — August 4, 1975, when Mrs. Bixler consulted another doctor — her suit was timely. On appeal, the Court of Appeals reversed the trial court, holding that under the continuing-course-of-treatment rule, "we cannot say as a matter of law that her treatment ceases with her last visit." *Bixler v. Bowman*, 24 Wn. App. 815, 819, 604 P.2d 188

(1979). The Court of Appeals noted that as long as the physician-patient relationship continued, Dr. Bowman had a duty of care to Mrs. Bixler. *Bixler*, 24 Wn. App. at 818.

We affirmed the trial court and held that the statute began to run on the date of Mrs. Bixler's last visit to Dr. Bowman, the alleged wrongful act. After describing the development of malpractice law leading to *Samuelson*, the court discussed the effect of RCW 4.16.350 on the continuing-course-of-treatment rule:

> [T]he 1971 statute *substantially modified* the continuing course of treatment rule formulated in *Samuelson v. Freeman, supra*. Under *Samuelson*, the cause of action would not accrue until, when there was a continuous and substantially uninterrupted course of treatment for a particular illness, the treatment for the particular illness or condition had been terminated. The 1971 statute restricts the commencement of the action to within "three years from the date of the *alleged wrongful act*". (Italics ours.) The concept of the termination of a "continuing course of treatment" has been succeeded by the designation of a "date of the alleged wrongful act".
>
> The date of the alleged wrongful act was April 29, 1975, the last time plaintiff consulted with defendant.

(Some italics ours.) *Bixler*, 94 Wn.2d at 150.

This is the third ground for our decision: our opinion in *Bixler* determined when a plaintiff must bring a claim for continuing negligent treatment. It did not address whether a plaintiff still had the right to make such a claim. The distinction we raised earlier with regard to *Samuelson* becomes important here; namely, that the statute of limitations and our ruling in *Bixler* modified the endpoint of the continuing-course-of-treatment rule. We held in *Bixler* that the event which triggers the statute of limitations had changed from the *termination* of a course of treatment, whether or not negligence occurred on that date, to the *last* negligent act committed by the defendant. Under the modified continuing-course-of-treatment rule, claimants must allege that the last negligent act, not simply the end of treatment itself, occurred within 3 years of filing suit.

We affirm today that malpractice claimants have the right to allege the entire course of continuing negligent treatment

as one claim. Our ruling in *Samuelson* that acknowledged such a right is still the law. The benefits of this rule are as ample as they are apparent. First, our tort law has recognized, and should recognize, that malpractice can occur in a series of interrelated negligent acts. To shoehorn this continuing negligent treatment into a single negligent act, occurring within 3 years of filing suit, deprives claimants of the chance to prove the full extent of negligence *in one claim*. The law should not require plaintiffs to split their claims. Furthermore, as described below, splitting claims has the practical and unfair effect of insulating health care professionals from liability for negligence occurring prior to the 3-year statutory period. We conclude therefore that where the tort is continuing, the claim is continuing.

Second, our ruling both presumes and confirms patients' reasonable reliance on their doctors. As members of an invaluable profession, doctors commonly hold the respect and trust of the people they treat. We find particularly apt the trial court's description of this relationship.

> The practice of medicine is a high skilled profession. Doctors are held in high regard, bordering on awe, by most individuals. Patients trust doctors implicitly and rely upon their advice and treatment without question, in most cases. . . . To hold that such a patient bears the risk of discovering the doctor's negligence seems to be inequitable.

Clerk's Papers, at 323-24. By recognizing continuing negligent treatment as one claim, we affirm that patients can reasonably rely on a doctor's advice without jeopardizing their rights to prove later that the entire course of treatment was negligent.

The trial court, however, ruled that the statute of limitations had run on all of Mrs. Caughell's claims dating prior to the 3-year statutory period. The court found itself bound by the ruling of *Adams v. Allen*, 56 Wn. App. 383, 783 P.2d 635 (1989). In *Adams*, the Court of Appeals held that in a claim for the negligent prescription of painkillers, the statute of limitations runs independently from each act of negligence. Plaintiffs Preston and Ruby Adams both received prescrip-

tions of Percodan and Percocet, narcotic painkillers, from defendant Dr. Albert Allen from 1974 through March 1985. In July 1986, the Adamses filed suit against Dr. Allen, alleging negligent prescription of the painkillers. On motion for summary judgment, the Superior Court ruled that Washington no longer recognized the continuing-course-of-treatment doctrine and, therefore, the wrongful act or omission — the Adamses' addiction — occurred more than 3 years prior to filing suit. *Adams*, 56 Wn. App. at 388.

The Court of Appeals reversed, ruling that "[e]ach time a prescription was written by Dr. Allen, allegedly in excessive quantities and/or without informing the Adamses of the risks, it was a separate wrongful act for purposes of the statute of limitation." *Adams*, 56 Wn. App. at 390. The Court of Appeals acknowledged the unique, continuing relationship between doctor and patient and reasoned that "a doctor is not insulated from liability simply because the first of the repeated wrongful acts occurred more than 3 years before the patient sued." *Adams*, 56 Wn. App. at 390. Unfortunately, the ruling in *Adams* did exactly that.

> We . . . reverse the entry of summary judgment as to that portion of the Adamses' action based on acts occurring within 3 years of the filing of their suit. If the Adamses can prove negligence and/or failure to inform, they may recover damages caused *during that time period*, but not before.

(Footnotes omitted.) *Adams*, 56 Wn. App. at 391. By not permitting plaintiffs to claim Dr. Allen's alleged continuing negligent treatment as one cause of action, the court's ruling had the practical effect of insulating Dr. Allen from liability for negligent treatment occurring more than 3 years before the Adamses filed suit.

The Court of Appeals erred in *Adams* by concluding that *Bixler v. Bowman*, 94 Wn.2d 146, 614 P.2d 1290 (1980) and RCW 4.16.350 ended a plaintiff's right to allege, as one claim, the entire course of negligent treatment. The outcome in *Adams* illustrates what happens if a claim for continuing negligent treatment does not exist. Patients must be on guard to discover within 3 years whether ongoing treatment

is negligent. If they detect negligence in the fourth year, patients can sue for treatment occurring in the past 3 years, no more. The plaintiff has a partial remedy, the negligent doctor has partial immunity, and the jury only hears part of the story. Accordingly, we overrule *Adams.*

As we noted in *Ruth v. Dight*, 75 Wn.2d 660, 453 P.2d 631 (1969) and *Samuelson v. Freeman*, 75 Wn.2d 894, 454 P.2d 406 (1969) the unique characteristics of medical malpractice require modified or, in this case, reaffirmed rules crafted from the common law. This court adopted such a rule by recognizing a claim for continuing negligent treatment in *Samuelson.* Because the subsequent statute of limitations for medical malpractice and our opinion in *Bixler* modified but did not extinguish this claim, we affirm the right of victims of malpractice to sue for damages arising from continuing negligent treatment.

## II

We next examine whether the statute of limitations expired in this case. *Bixler* requires a malpractice claimant to allege that a negligent act occurred within the 3-year statutory period. Therefore, in response to Defendants' motion for summary judgment, Mrs. Caughell had to present some evidence that such an act or omission took place after January 30, 1988. *See Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 65-66, 837 P.2d 618 (1992) (burden of establishing specific and material facts to support each element of prima facie case). To decide whether she has made this showing, we address three questions: (1) what are the elements of a claim for continuing negligent treatment, (2) did Mrs. Caughell allege specific and material facts that some portion of the continuing negligent treatment occurred after January 30, 1988,[3] and (3) does the discovery rule bar her claim?

The Legislature stated the elements of medical malpractice in RCW 7.70.040:

---

[3]At oral argument, counsel for Respondents Group Health and Dr. Sherry explained that the parties had agreed to limit discovery only to issues concerning the statute of limitations. We therefore limit our review of the record to these issues and express no opinion on the merits of any substantive claim.

(1) The health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances;

(2) Such failure was a proximate cause of the injury complained of.

This court has interpreted these elements as particularized expressions of the four traditional elements of negligence: duty, breach, proximate cause, and damage or injury. *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 468, 656 P.2d 483 (1983); *see also Harris v. Groth*, 99 Wn.2d 438, 444-45, 663 P.2d 113 (1983) (reasonably prudent practitioner is measure for standard of care).

■ The proof required for a claim of continuing negligent treatment differs slightly on two of these elements: breach and proximate cause. To prove a breach or, in the words of the statute, a failure to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider, a plaintiff must show that a series of interrelated negligent acts occurred during the course of treatment for a medical condition. By "series", we mean two or more negligent acts. By "interrelated", we mean that the negligent acts must be part of a "substantially uninterrupted course of treatment", and must relate to the treatment as a whole. *Samuelson*, 75 Wn.2d at 900. However, the negligent acts need not relate to each other. If a health care provider performs two procedures negligently as part of a course of treatment, the patient may allege a claim for negligent treatment even though the two procedures have no intrinsic connection to each other. They must only be part of the same treatment. Finally, by "treatment" we mean the protocol, procedures, prescriptions, or other medical actions ordered or performed by the health care provider.

The second modified element is proximate cause. To state a claim for continuing negligent treatment, a plaintiff must show that the series of interrelated negligent acts caused the injury or damages at issue. The plaintiff need not prove which negligent act caused which injury, provided that

plaintiff proves that the continuing negligent treatment was the proximate cause of the injury. With this relatively minor difference in proof, a plaintiff's evidentiary burden remains the same.

Certainly, questions of interpretation will arise, and we leave the decision to the trial courts in the first instance as to whether a plaintiff has stated a claim for continuing negligent treatment. However, we note one example of the failure to state a claim. A plaintiff may not simply allege a negligent act followed by nonnegligent treatment. The malpractice claimant must prove that the subsequent care was negligent in its own right.

After reviewing the record, we conclude that Mrs. Caughell has alleged facts sufficient to establish a claim for continuing negligent treatment occurring after January 30, 1988. First, she alleges, apparently without contradiction, that she was a member of Group Health and a patient of Dr. Sherry's from 1965 through at least March 1, 1988. Given this proof of a doctor-patient relationship after January 30, 1988, Defendants, as health care providers, owed a duty of care to Mrs. Caughell through at least March 1, 1988.[4] Second, Mrs. Caughell alleges that Dr. Sherry breached his duty of care by improperly prescribing Valium to her from February 13, 1968, through March 1, 1988, and Etrafon through January 27, 1988. Although Dr. Sherry discontinued Etrafon prior to January 30, 1988, Mrs. Caughell contends that withdrawal of this antidepressant without appropriate monitoring for movement disorders was negligent. Mrs. Caughell offers the declaration of her neuropsychiatrist as proof.

We find that Mrs. Caughell has alleged specific facts that Defendants may have breached their duty of care after January 30, 1988. Dr. Sherry repeatedly prescribed Valium and Etrafon, according to Mrs. Caughell, without monitoring for physical and psychological side effects. These multiple

---

[4]Defendant Group Health has not proposed a reason to distinguish between Dr. Sherry and itself. Accordingly, our discussion of Mrs. Caughell's claim against Dr. Sherry applies with equal force to Group Health.

prescriptions constitute a series of interrelated acts or omissions occurring in the course of treatment. Furthermore, Mrs. Caughell's neuropsychiatrist alleges that these prescriptions, viewed together, were negligent both because of Defendants' failure to monitor side effects, and also Defendants' failure to obtain Mrs. Caughell's informed consent to the potential effects of the drugs. The prescriptions were therefore an alleged series of interrelated negligent acts or omissions extending into the statutory period.

Defendants contend that, at best, the record supports a finding that the last alleged negligent act occurred on November 18, 1987, when Dr. Sherry wrote his final prescription for Valium. We do not take so narrow a view. The physical act of writing a prescription is only part of the alleged negligence. Mrs. Caughell has presented evidence that Defendants' failure to *monitor* the effects of Valium and Etrafon may have breached the duty of care owed to her. We hold, therefore, that when a physician prescribes a drug to a patient, the physician's duty of care extends throughout the length of the prescription or, in other words, throughout the patient's use of the drug as instructed by the physician. Defendants' records in this case establish that Mrs. Caughell's prescription for Valium did, in fact, run through March 1, 1988. This fact, combined with the allegations of Mrs. Caughell's medical witnesses, is sufficient evidence of Defendants' alleged breach of the duty of care. Whether such a breach occurred is a question of fact.

Mrs. Caughell has also presented evidence of proximate causation and damages from Defendants' alleged negligence. According to her medical experts, Mrs. Caughell became addicted to Valium and now suffers from simple and complex movement disorders by reason of Defendants' failure for 20 years to monitor the physical effects of taking Valium and Etrafon. Furthermore, Mrs. Caughell's diary documents the alleged physical and psychological pain resulting from her withdrawal from the drugs. We find there is sufficient evidence of proximate causation and damages occurring after January 30, 1988, to avoid summary judgment. As described

above, the fact that Mrs. Caughell cannot prove which prescription caused which injury is irrelevant. Plaintiff need only prove that the continuing negligent treatment extended into the statutory period and that damages arose from this final portion of the negligent treatment.

Because Mrs. Caughell provided sufficient evidence of continuing negligent treatment within the statutory period, the trial court's grounds for granting summary judgment are in error. Defendants argue that the statute of limitations has expired for a second reason: Mrs. Caughell knew the basis of her malpractice claim at least 10 years prior to her last visit with Dr. Sherry. Defendants contend that Mrs. Caughell's fear of addiction in the late 1970's and early 1980's establishes that she discovered her malpractice claim at that time. Under the discovery rule in RCW 4.16.350, Mrs. Caughell had 1 year from the date of her discovery to file her claim.

Plaintiff interprets Defendants' argument as one under the discovery rule in RCW 4.16.350. Plaintiff asserts that application of the discovery rule in the middle of her claim misconstrues the statute of limitations. Under the statute, a malpractice claimant must file suit within 1 year of discovery or 3 years after the negligent act, "whichever period expires *later*". (Italics ours.) RCW 4.16.350(3). Plaintiff argues the discovery rule comes into play only when more than 3 years have passed since the last negligent act or omission.

■ We disagree. If, during the course of treatment, a patient discovers the treatment has been negligent, the 3-year limitations period under RCW 4.16.350 begins. 1 David W. Louisell & Harold Williams, *Medical Malpractice* ¶ 13.08, at 13-34 (1990) (when patient learns of negligence during treatment, "the statute runs from the time of discovery, actual or constructive"). The patient's discovery of facts sufficient to establish continuing negligent treatment obligates the patient to take action from that moment on. This discovery marks the end point of a claim for continuing negligent treatment. *Ballenger v. Crowell*, 38 N.C. App. 50, 59-60, 247 S.E.2d 287, 16 A.L.R.4th 989 (1978) (statute runs "at the

time the patient knew or should have known of his injury, even if this occurs prior to the severance of the doctor-patient relationship"); *Sheldon v. Sisters of Mercy Health Corp.*, 102 Mich. App. 91, 95, 300 N.W.2d 746 (1980) (statute runs from discovery of potential malpractice).

We note discovery of continuing negligent treatment, *during the course of treatment*,[5] resembles but is not identical to the operation of the discovery rule under RCW 4.16.350. Because the negligent treatment has continued up to the moment of discovery, the 3-year rather than 1-year limitations period applies. Put another way, the discovery of negligence during the course of treatment marks the last negligent act under RCW 4.16.350, triggering the 3-year statutory period. Operation of the discovery rule in the statute would allow only 1 year to file suit.[6] In this respect, discovery of negligence during the course of continuing negligent treatment differs from the operation of the discovery rule under RCW 4.16.350.

■ ■ Discovery of negligent treatment resembles the discovery rule in that the standard of proof is identical for both. Discovery of continuing negligent treatment occurs "when a claimant knows, or in the exercise of due diligence should have known, all the essential elements of the cause of action, specifically duty, breach, causation and damages." *In re Estates of Hibbard*, 118 Wn.2d 737, 752, 826 P.2d 690 (1992).

> The discovery rule does not require knowledge of the existence of a legal cause of action. As explained in *Sahlie v. Johns-Manville Sales Corp.*, 99 Wn.2d 550, 554, 663 P.2d 473 (1983),
>
> > While in most cases knowledge, actual or imputed, of the essential elements of the action will probably amount to knowledge of the existence of the cause of action, this is not necessarily so. A plaintiff may well be aware of the facts comprising the essential elements of the action without being aware that he has a legal cause of action.

---

[5]The discovery rule does take effect if discovery of the negligent treatment occurs more than 3 years but not more than 8 years after the last negligent act. Under these circumstances, the 1-year statutory period applies. RCW 4.16.350.

[6]The statute of limitations reinforces this point by allowing plaintiffs to file suit 3 years after the last negligent act or 1 year after discovery of the negligence, "whichever period expires later". RCW 4.16.350(3).

Negligence issues normally involve factual disputes to be resolved by the trier of fact. If no genuine issue of material fact is presented when the motion for summary judgment is heard, the issue may be summarily resolved.

(Footnotes omitted.) *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 769-70, 733 P.2d 530 (1987). Furthermore, as in the case of the discovery rule, whether discovery of continuing negligent treatment occurred is a question of fact. *See Ohler v. Tacoma Gen. Hosp.*, 92 Wn.2d 507, 510, 598 P.2d 1358 (1979) (discovery a question of fact).

Turning to the facts of this case, we find the dispute over Mrs. Caughell's knowledge of her alleged addiction, a genuine issue of material fact, precludes summary judgment. Defendants contend Mrs. Caughell thought about the possibility of addiction to Valium after she read two books on the subject. Her questions to Dr. Sherry and her alleged attempts at temporary withdrawal, according to Defendants, establish her knowledge in the late 1970's or early 1980's of the essential elements of her claim. In response, plaintiff claims she did not know Dr. Sherry breached his duty of care to her, or that his negligence was the cause of her injuries, until she ended treatment in March 1988. Plaintiff also contends Dr. Sherry assured her she was taking a low dosage and should not worry about addiction. The parties' arguments raise genuine issues over what Mrs. Caughell knew, when she knew it, and what effect Dr. Sherry's alleged statements may have had on her knowledge.

These questions are all material to whether discovery occurred. The essential element here is whether Mrs. Caughell *knew* she was addicted. Once she knew this, she could have easily concluded Dr. Sherry's prescriptions of Valium were inappropriate. If Mrs. Caughell only worried about the possibility of addiction when she questioned Dr. Sherry, then the trier of fact may reasonably conclude she neither knew nor should have known the prescriptions were negligent. However, if she knew she was addicted, and the books she read only confirmed this, then the trier of fact could conclude she knew or should have known that Dr. Sherry's successive prescriptions were in error. Mrs. Caugh-

ell's discovery of continuing negligent treatment arises from her knowledge of her own addiction. Anything Dr. Sherry may have told Mrs. Caughell about her use of Valium and Etrafon, and her reliance on his advice, is relevant evidence of her knowledge.

We remand this case to the trier of fact to determine whether Mrs. Caughell discovered the essential elements of her claim. If she did, as alleged, make this discovery in the late 1970's or early 1980's, then the 3-year limitations period has expired on negligence occurring prior to discovery. For any known acts of negligence following discovery, a separate statutory period applies to each negligent act. Thus, the statute would expire on all negligent acts occurring more than 3 years prior to Mrs. Caughell's complaint. Although this outcome is similar to that in *Adams v. Allen*, 56 Wn. App. 383, 783 P.2d 635 (1989), Mrs. Caughell's *knowledge* of the alleged negligence, not the lack of a claim for continuing negligent treatment, dictates this result.

## Conclusion

We affirm a plaintiff may allege the entire course of continuing negligent treatment as one claim of medical malpractice. The elements of this claim are: (1) a duty of care owed by a health care provider to the plaintiff, (2) a breach of this duty through a series of interrelated negligent acts or omissions occurring during the course of treatment, (3) proximate causation between the continuing negligent treatment and the patient's injuries, and (4) damages arising from the continuing negligent treatment. Therefore, we reverse the trial court's entry of summary judgment and final judgment. This case is remanded to the trial court for further proceedings in accordance with this opinion.

UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, JOHNSON, and MADSEN, JJ., concur.